## Richmond

### FRUIT GROWERS EXPRESS COMPANY V. CITY OF ALEXANDRIA.

January 16, 1976.

Record No. 740856.

Present, All the Justices.

*Fred C. Alexander, Jr. (Booth, Prichard & Dudley,* on briefs), for plaintiff in error.

*Harry P. Hart (Murphy, Hart & O'Neill,* on brief), for defendant in error.

POFF, J., delivered the opinion of the court.

Fruit Growers Express Company (landowner) filed an application pursuant to Code § 58-1145 (Repl. Vol. 1974) for relief from erroneous tax assessment made by the City of Alexandria (the City). On the City's motion, the trial court struck landowner's evidence and, by final order entered May 3, 1974, dismissed the application.

The subject property is a 30.55 acre tract zoned I-2 (heavy industrial). It is situated near the highway interchange between Interstate 495 (Beltway) and Telegraph Road. The northern boundary

lies one block south of and parallel to Duke Street. The southern boundary parallels the rights of way of the RF&P and Southern railroads. At a width of 350 feet between these boundaries, the property runs a distance of 4,000 feet between Quaker Lane on the west and Telegraph Road on the east. The land is nearly level, but its elevation is below that of land to the north. Although the subject property is improved by railroad spur tracks, shop buildings, and hardstand storage and work areas, landowner did not challenge the assessment on these improvements but only the assessment on the land itself. The challenged assessment was based on an appraisal of $2,030,700, a valuation of approximately $1.53 per square foot.

Under familiar principles, we review the depositions and *ore tenus* evidence in the light most favorable to landowner.

Walter C. Robbins, Jr., a general contractor engaged in development of large industrial properties, testified that the highest and best use of the property was industrial. He further testified he would either develop the property as an industrial park and "sell off units", or construct three large buildings of "high cubage" to be leased for "bulk storage or manufacturing". Robbins said that he "would probably develop [the subject property] into three buildings of at least 100,000 feet each, in three stages over a period of three to five years", and that, because of inflation, it would be "less expensive to do all the [development] work at one time and pay the carrying costs". When asked about market value, Robbins said:

> "I don't think you can take and put a value on that piece of ground until you decide what your development costs are to have it ready to build. You have to back into value of ground . . . . You don't know until you decide exactly how many dollars worth of development costs are involved.
>
> . . .
>
> "Now, whatever these development costs are should be subtracted from whatever you feel the value is less whatever profit you want to make or expenses; and that is the net value of that land today for that use."

Kenneth Marks, a corporate official engaged in the buying, selling, and leasing of "warehouse space", stated that raw land must be valued on "an individual basis", and that the market value for the subject property would be computed by first estimating the "gross rental income" from leases of warehouse space, the development costs,

and the expected return on cash invested. Marks believed that a developer would require a "minimum" return on equity, before taxes, of 12 per cent, and projected the "sell-out" or "lease-out" time at "three to six years".

Landowner's next witness, Arthur Crawford Mosely, Jr., was a "developer of industrial and warehouse properties." He testified that he "basically works backwards in determining market value", *i.e.*, after estimating the "market rents for a certain location", he "would determine whether that rent would support whatever is being asked for the land."

Dolph R. Traver, a real estate investment manager knowledgeable in the valuation of large tracts suitable for automobile dealerships, testified that the subject property was not suitable for that purpose. He said that market price is a function of land development costs and that such costs "are routinely investigated before serious negotiations with the seller."

After the assessment was made by the City, landowner employed Walter Lee Phillips, Jr., a professional engineer and land surveyor, to prepare a "feasibility study" for the subject property. At trial, Phillips estimated that the development costs for a "layout to maximize the industrial warehouse space" on the property would be $1,310,346. Without objection, landowner introduced an exhibit showing itemized cost estimates prepared by Phillips. This exhibit showed that the development costs would be incurred in four separate phases, but it did not show the time interval for each phase or the total time period over which development costs would be incurred.

Landowner's principal witness, McCloud B. Hodges, Jr., a professional appraiser, testified that "the maximum monetary profit from this land can be derived on the 1st of January, '72, by developing a good quality—and it would have to be good quality—permanent warehouse park with rail service serving the back ends of almost all of the buildings backing up to it." He further stated that the property should be "subdivided and sold in smaller parts to various users."

Hodges' opinion of the market value of the subject property on January 1, 1972, was premised upon "development cost analysis", a valuation method designed to determine the value of the property "as it could be developed". Hodges conceded that comparable sales would have provided a better valuation approach but said that he "didn't have enough market data" on sales of unfinished land. He explained that his appraisal method involved a process of "working.

backwards" or "backing into" present market value after first determining anticipated income from sales of finished sites. Expanding upon his explanation, Hodges said:

> "The development costs are the important thing, because the difference between the retail value of the finished site in the aggregate and the total development costs and other costs, such as the time value of money, the interest on the deferred purchase money note to the seller of the land and the interest on the development or construction loans, the difference between all the income and all the expenses represents land value; and that is the basis for the entire valuation."

Hodges further testified that the market data on sales of *finished* industrial sites, (*i.e.*, graded sites with all utilities and drainage facilities in place), situated on land comparable to the subject land, showed market values within a range of $1.50 to $2.25 per square foot on January 1, 1972. Hodges believed that if the subject property were developed as an industrial park and individual lots were sold, it would "command the highest price in that range, $2.25 a square foot, for all of our net usable land." Hodges estimated that, as a finished industrial park, the property would have a value of $2,454,206 but said that because of market absorption limitations, there would be "a minimum development time of 3½ years and a maximum development time of 6½ years."

Utilizing a portable computer programmed for discounted cash flow analysis, Hodges obtained a print-out showing 12 different "value range estimates". Over the City's objection, the trial court admitted the print-out as Exhibit 9 and a work sheet related to it as Exhibit 8. The 12 value estimates were based upon the following data:

The projected gross sales revenues of $2,454,206 (for finished industrial lots);
The engineer's estimate of development costs of $1,310,346;
Down payments of 5%, 15%, and 25%;
Loan acquisition interest rates of 7%, 8%, and 9%;
An effective land development loan interest rate of 12%;
An assumed acquisition loan curtailment of 110%;
A land development loan curtailment of 125%;
Development in four phases within periods of three and one-half years, four and one-half years, and six and one-half years; and

A 30% (before tax) rate of return on equity for the prospective purchaser or developer.

The highest of the 12 values was $761,000 (57 cents per square foot), and the lowest was $464,364 (35 cents per square foot). The mean was $599,000 (45 cents per square foot), and the standard deviation was $88,000. Hodges interpreted these values as showing that "there would be a 64 per cent probability that the property would sell for, in the first instance, no more than $88,000 above $602,000.00 and no more than $88,000.00 below $602,000.00. . . ." The mean valuation of 45 cents per square foot, in Hodges' opinion, was "a fair valuation for tax purposes."

The trial court made two separate rulings, to both of which landowner assigns error. First, the trial court sustained the City's objection to exhibits 8 and 9 and struck Hodges' testimony related thereto "on the ground that the exhibits and the testimony relate to a method of valuation of unimproved real estate based on assumptions which are necessarily speculative." Second, the trial court sustained the City's motion to strike all of landowner's evidence and dismissed the application "on the ground that [landowner] failed to sustain the burden of proof imposed by the applicable statute . . . in that [landowner] did not show that the property in question was assessed at more than its fair market value in 1972. . . ."

■ Article 10, § 2 of the Constitution of Virginia requires that "[a]ll assessments of real estate . . . shall be at their fair market value. . . ." In tax assessment cases, as in eminent domain proceedings, the fair market value of property is "the price it will bring when offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of having it." *Fonticello Mineral Springs Co.* v. *City of Richmond,* 147 Va. 355, 361, 137 S.E. 458, 460 (1927). In determining fair market value, "all the capabilities of the property and all the uses to which it may be applied or for which it is adapted, are to be considered. . . ." *Tuckahoe Woman's Club* v. *City of Richmond,* 199 Va. 734, 738, 101 S.E.2d 571, 574 (1958). And we have held that an accurately drawn plat, showing unimproved land subdivided into individual lots, is admissible to establish "the use for which the land was best adapted. . . ." *Appalachian Elec., Etc. Co.* v. *Gorman,* 191 Va. 344, 358, 61 S.E.2d 33, 40 (1950). *See also Appalachian Power Co.* v. *Anderson,* 212 Va. 705, 714, 187 S.E.2d 148, 156 (1972) (Concurring opinion of four Justices).

But here, the first question we must decide is, not whether Exhibits 8 and 9 and Hodges' testimony based upon those exhibits are admis-

sible to show the feasibility of a particular land use option, but rather whether such evidence is admissible to prove the fair market value of the land. In the abstract, the question is the admissibility of evidence designed to prove the present fair market value of raw land by a process of "backing into" that value, *i.e.*, by deducting the estimated costs of developing that land to a particular use from the income expected from the sale or lease of that land when finished for such use.

> "Valuation based upon an estimate of the potential income which might be realized from utilization by the owner of the property in a manner of which it is capable (but of which he has not yet availed himself) has generally been rejected on the ground that such income is too uncertain and conjectural to be acceptable."

4 Nichols, *The Law of Eminent Domain* § 12.312[2] at 12-150 to 12-151 (3d ed. rev. 1975).

> "The measure of compensation is not the aggregate of the prices of the lots into which the tract could be best divided, since the expense of clearing off and improving the land, laying out streets, dividing it into lots, advertising and selling the same, holding it and paying taxes and interest until all the lots are disposed of cannot be ignored, and it is too uncertain and conjectural to be computed."

4 Nichols, *supra*, § 12.3142[1][a] at 12-263 to 12-265.

In *Appalachian Power Co.* v. *Anderson, supra,* 212 Va. at 711, 187 S.E.2d at 153-54, quoting from *Barnes* v. *North Carolina State Highway Commission,* 250 N.C. 378, 388-89, 109 S.E.2d 219, 228 (1959), we said that " '. . . undeveloped property may not be valued on a per lot basis. *The cost factor is too speculative.*' " (Emphasis added).

In *Anderson,* we held that the landowner's evidence "based on the capitalization of income method was improperly admitted." 212 Va. at 712, 187 S.E.2d at 155. Because the property there was undeveloped, we said that such evidence was inadmissible because it was based upon "future or prospective uses to which the land may be applied, predicated on speculation or conjecture." *Id.* Our holding in *Anderson* conforms with the rule followed in the majority of jurisdictions.[1]

---

[1] *See, e.g., State* v. *2.7089 Acres of Land, etc.,* 256 A.2d 275, 287 (Del. Super. 1969); *Department of Highways* v. *Schulhoff,* 167 Colo. 72, 78, 445 P.2d 402, 405 (1968); *Yoder* v. *Sarasota County,* 81 So.2d 219, 221 (Fla. 1955); *Commonwealth* v. *Evans,* 361 S.W.2d 766, 770 (Ky. 1962); *State Highway Commission* v. *Conrad,* 263 N.C.

"[T]he owner may offer a plan showing a possible scheme of development for the purpose for which it is most available, provided it appears that the likelihood of demand for the property for that purpose is such as to affect market value. He cannot, however, go further and describe in detail to the jury a speculative enterprise for which in his opinion (or that of some expert) the land might be used, and base his estimate of value upon the profits which he would expect to derive from the enterprise. In other words, *he cannot capitalize the projected earnings of a non-existent enterprise or projected use.* The owner cannot, for example, introduce evidence of the return that he would derive from cutting up a vacant tract of land into building lots, since this would involve pure conjecture as to how fast the lots would be sold and the price that each would bring; *and the details of a possible improvement of the land, and its value, or the expected profits or rentals after such improvement was completed are equally inadmissible,* for the same reason. The trial court cannot be too careful in excluding evidence of this character, as witnesses can always be found who will, in their imagination, cover the most hopelessly unmarketable vacant land in the neighborhood with apartment houses filled with desirable tenants, and with the aid of a little figuring, capitalize the prospective net income at ten times the actual value of the land." 5 Nichols, *supra*, § 18.11[2] at 18-53 to 18-57. (Emphasis added).

Here, the value at which Hodges arrived was a "mean" between high and low estimates. Those estimates of present value were the results of estimates of future values and future costs. The estimates of future values and costs were based upon certain premises, assumptions, and contingencies and upon possible variables and alternatives of each, with respect to the viability of which expert witnesses are prone to disagree.[2] All that the evidence related to development cost

394, 397, 139 S.E.2d 553, 556 (1965); *Barnes* v. *North Carolina State Highway Commission, supra; State* v. *Deal,* 191 Ore. 661, 671-72, 233 P.2d 242, 247 (1951); *L'Etoile* v. *Director of Public Works,* 89 R.I. 394, 401, 153 A.2d 173, 177 (1959).

[2] Here, the record shows that landowner's experts expressed different opinions concerning certain critical assumptions. For example, Marks testified that a developer would require a minimum 12% before tax return on equity, while Hodges said that a 30% before tax return was necessary to attract purchasers; Robbins believed that the highest and best use of the subject property would be for either subdivision and sale of finished industrial lots, or for rental of bulk storage space in three large warehouses, while Hodges believed that the highest and best use would be realized only if the subject property was developed and subdivided for sale as an industrial park; and Robbins was of opinion that the development costs should be incurred at one

analysis indicated was that a particular purchaser might be willing to pay a price equal to the "mean" if he relied upon a particular interfusion of assumptions and future projections. But fair market value is not the theoretical price a particular purchaser might be willing to pay. Rather, fair market value "is the *present actual value of the land* with all its adaptations to general and special uses, and not its prospective, speculative or possible value, based on future expenditures and improvements, that is to be considered." *Appalachian Power Co.* v. *Anderson, supra,* 212 Va. at 708, 187 S.E.2d at 152. (Emphasis added).

We hold that Exhibits 8 and 9 and Hodges' testimony concerning development cost analysis were conjectural and speculative and that the trial court properly excluded that evidence.[3]

We consider now whether the trial court erred in striking all of landowner's evidence and dismissing its application. The burden of proving overassessment is upon the landowner, Code § 58-1145, and the assessment enjoys a presumption of correctness. *N. and W. Ry. Co.* v. *Commonwealth,* 211 Va. 692, 695, 179 S.E.2d 623, 626 (1971). Landowner argues that Hodges' testimony shows that the valuation upon which landowner's *unfinished* property was assessed ($1.53 per square foot) was within the low end of the range of prices recently paid for certain *finished industrial tracts* ($1.50 to $2.25 per square foot). Hodges could not say, however, that the characteristics of landowner's property were substantially different from those of the finished tracts; on cross-examination he conceded that he did not know "anything about the specific conditions" or the shape or topography of those tracts, whether they had been graded and filled, or whether they were served by rail facilities. Other evidence shows

---

time, while Phillips and Hodges believed that such costs could be more efficiently incurred in "stages" or "phases".

[3] A minority of jurisdictions have admitted valuation evidence based upon the development cost approach. *See Dash* v. *State,* 491 P.2d 1069, 1074 (Alaska 1971); *State Highway Commission* v. *Lee,* 207 Kan. 284, 299, 485 P.2d 310, 321 (1971) (4-3 decision); *Iske* v. *Metropolitan Utilities District of Omaha,* 183 Neb. 34, 43, 157 N.W.2d 887, 894 (1968); *Tacchino* v. *State Dept. of Highways,* 89 Nev. 150, 153-54, 508 P.2d 1212, 1214 (1973) (3-2 decision).

In rejecting that view here, we note what was said by the Supreme Court of Florida in *Yoder* v. *Sarasota County, supra,* 81 So.2d at 221 (see footnote 1):

"It is not proper to speculate on what could be done to the land or what might be done to make it more valuable and then solicit evidence on what it might be worth with such speculative improvements at some unannounced future date. To permit such evidence would open a flood-gate of speculation and conjecture that would convert an eminent domain [or tax assessment] proceeding into a guessing contest." (Citations omitted).

that landowner's property, while not subdivided into lots or otherwise finished, was nearly level and was served by public roads, public utilities, and rail facilities.

Landowner asserts that ". . . the city should have been required to attempt to rebut the taxpayer's case by showing that there were comparable sales supporting its valuation". We disagree.

> "The effect of this presumption [of the correctness of the tax assessment] is that even if the assessor is unable to come forward with evidence to prove the correctness of the assessment this does not impeach it since the taxpayer has the burden of proving the assessment erroneous. *Shaia* v. *City of Richmond*, 207 Va. 885, 893 (fn. 7); 153 S.E.2d 257, 263 (1967)." *N. and W. Ry. Co.* v. *Commonwealth, supra.*

We hold that landowner's evidence was insufficient to overcome the presumption; that landowner failed to make a *prima facie* case of overassessment; and that the trial court properly granted the city's motion to strike all of landowner's evidence. The judgment is

*Affirmed.*

CARRICO, HARRISON and COMPTON, JJ., dissenting.