## CIRCUIT COURT OF SHENANDOAH COUNTY

Shenandoah Associates

    v.

Shenandoah County

July 2, 2003

Case Nos. (Law) CL98-132 and CL01-140

BY JUDGE DENNIS L. HUPP

The petitioner, Shenandoah Associates (hereinafter "owner"), owns improved real estate in the Town of Woodstock known as John S. Perry House. This is a sixty-two-unit, housing facility for the elderly and handicapped. In 1996, the County of Shenandoah assessed the property as follows: land: $151,800.00; building: $2,154,600.00; total: $2,305,400.00. The owner claims that this valuation is erroneous and petitions this court to correct the tax assessments based thereon pursuant to Virginia Code § 58.1-3984. The owner has filed two petitions, the first bearing docket number CL98-132 pertaining to the tax years 1996, 1997, and 1998, and the second bearing docket number CL01-140 pertaining to tax years 1999 and 2000. These were heard together.

The assessment made by the County enjoys a presumption of correctness, *American Viscose Corp. v. City of Roanoke*, 205 Va. 192, 135 S.E.2d 795 (1964); *Fruit Growers Express Co. v. City of Alexandria*, 216 Va. 602, 221 S.E.2d 157 (1976). The presumption can be rebutted upon showing of manifest error or total disregard of controlling evidence. *Arlington County Bd. v. Ginsberg*, 228 Va. 633, 325 S.E.2d 348 (1985). See also Virginia Code § 58.1-3984.

There is some confusion surrounding the appraisal method employed by the County. In answers to interrogatories, the Shenandoah County Commissioner of the Revenue had responded that the cost approach was used in valuing the property; however, Michael Didawick of Blue Ridge Appraisal Company, the firm that conducted the subject re-appraisal of Shenandoah County real estate, testified that a "market study" was performed and served as the basis for the valuation. He stated that this was the normal manner in which his firm conducted a "mass appraisal." He suggested that it was not possible to do a normal sales comparison for each parcel, as one might do in a "fee appraisal," because of the enormity of the task at hand. He explained that a market study involved making a general comparison of similar types of property in the various jurisdictions in which his firm conducted appraisals rather than making comparisons to specific properties. He further explained that the resulting value for each property was then broken down in a cost-approach format on the tax assessment cards kept and maintained by the Commissioner's Office whereby values were assigned to various aspects of the improvements. The reason for this remains unclear to me.

In my view, the owner challenges the County's appraisal on two grounds primarily. First, the owner contends that the County used the cost-less-depreciation approach in its appraisal and that the Virginia Supreme Court has rejected the use of this approach for tax assessment purposes. Secondly, the owner points out that the County failed to give consideration to the special nature of this property, that it is government-regulated, in any appraisal method it employed in this case.

The owner also argues that the County employed the more common valuation methods only after this litigation ensued and that its analysis under each method is flawed.

In the first regard, I do not believe that the Virginia Supreme Court has enunciated any blanket proscription against the use of the cost approach in appraising real estate for tax purposes. The Court ruled that "the use of depreciated reproduction cost as the sole basis for determining fair market value is erroneous only where the taxing authority fails to consider other factors that plainly show such a method 'would patently lead to unfair and improper results'." (Citations omitted.) *Tidewater Psychiatric Inst. v. City of Virginia Beach*, 256 Va. 136, 142, 501 S.E.2d 761 (1998). See also *Board of Supervisors v. HCA Health Services*, 260 Va. 317, 330, 535 S.E.2d 163 (2000). Here, notwithstanding the interrogatory response of the Commissioner

of the Revenue, the cost approach was not used by the County in the original reassessment.

The owner has been persistent in arguing that the capitalization-of-income approach is the only valid method of appraising this type of property and that the County erred when it ignored this appraisal method initially. The Virginia Supreme Court, as far as I can tell, has never ruled that the income approach must be used in appraising income-producing property. Indeed, by way of example, I note that it has insisted that a recent sale of the same property be considered in determining fair market value, and this would entail a market-type analysis. *Board of Supervisors v. Donatelli & Klein*, 228 Va. 620, 325 S.E.2d 342 (1985); and *Arlington County Bd. v. Ginsberg*, 228 Va. 633, 325 S.E.2d 348 (1985). The Court has acknowledged that the income approach is the preferable method in appraising such property. *Arlington County Bd. v. Ginsberg, supra*, at 640; and *Nassif v. The Board of Supervisors*, 231 Va. 472, 484, 345 S.E.2d 520 (1986). The Court has further ruled that, if the capitalization of income method is used, then actual contract rents must be considered. *Fairfax County v. Nassif*, 223 Va. 400 (1982); and *Tysons International v. Board of Supervisors*, 241 Va. 5 (1991).

The owner's experts both employed the capitalization-of-income approach, and both rejected other appraisal methods. Kevin Nolan, a real estate appraiser from Texas, adopted the appraisal report prepared by an associate in his firm and testified that the cost approach was not appropriate because this was not new construction and that the market approach was not appropriate because there were no local sales of this type of property, that it is government-regulated, for comparison. He opined that the income approach was the only appropriate method of valuation, and, in using it, he determined the value of the property to be $1,874,000.00. Kenneth Peltzer, Ph. D., M.A.I., a long-time Virginia real estate appraiser, also declined to use the cost and market approaches for the same reasons as suggested by Mr. Nolan. Dr. Peltzer appraised the property at $1,730,000.00.

As I understand his testimony, Mr. Nolan, in determining net income for the property, used actual contract rents but then used projected expenses for all years after the first year, 1996. He then conducted a discounted cash flow analysis made necessary by reason of the H.U.D. restrictions on this property. Under this analysis, Mr. Nolan found diminishing annual net income for the period of 1996 through 2002, specifically a fall from $221,206.00 in 1996 to $178,733.00 in 2002. He employed a "going-in" capitalization rate of 10.6% and a "terminal" capitalization rate of 11.6%. As I understand it, the higher

rate factors in the projected decreased annual income under his discounted cash flow analysis. On the other hand, Dr. Peltzer used a stable annual net income of $260,000.00 and employed a capitalization rate of 15%. Each of these gentlemen specifically testified that he factored into his analysis the government regulations and restrictions currently applicable to the John S. Perry House.

While these were not conducted at the time of the original reassessment, appraisals using other methods were offered into evidence by the County. Mr. Didawick testified as to his analysis under the income approach and the cost approach. In each instance, he derived a value higher than the tax assessment value at issue here. In the former regard, he adopted the same net income figure as Dr. Peltzer but then used a capitalization rate of 10.6%, the same as Mr. Nolan's initial rate. Robert Gentry, M.A.I., another long-time Virginia real estate appraiser, conducted appraisals under the three most commonly used methods, market, cost, and income, and, in each instance, determined a value in excess of the tax assessment value at issue in this case. In the last regard, he found the annual net income to be $284,000.00 and used a capitalization rate of 9.45%. Neither of the County's experts gave weight to the nature of the property, that it is government-regulated. The County has been equally persistent in arguing that these government regulations and restrictions can be removed upon discharge of the current mortgage indebtedness and that such discharge would occur upon sale of the real estate.

While there are several discrepancies among the appraisals offered by the four appraisers, it appears to me that the crucial difference is found in the treatment given to the nature of the property as repeatedly mentioned herein. Would the government regulations and restrictions disappear upon release of the mortgage and thus render the property subject to normal market forces?

The deed of trust on the property does not reserve the right of prepayment. I do not believe that, under Virginia case law, a debtor has the right to prepay in full where the instrument or contract calls for repayment in installments with interest and does not provide for the right of prepayment. *Graeme v. Adams*, 64 Va. (23 Gratt.) 225 (1873). This was the rule at common law. See 55 Am. Jur. 2d, *Mortgages*, § 345 (1996). While this has been changed by statute for some transactions, I do no read these statutes as applying to our situation. See Virginia Code Title 6.1, Chapter 7.3, Article 12 (§§ 6.1-330.80 et seq.). Indeed, § 6.1-330.81 excepts governmentally-regulated loan contracts from its provisions for prepayment. (I note that its provisions would not apply to our case anyway because of the loan amount.)

Authorities have been submitted by counsel on both sides concerning prepayment of H.U.D.-guaranteed loans. Much of this information post-dates the time in question, January 1, 1996. The Housing Opportunity Program Extension Act of 1996, which created a right of prepayment with minimal conditions, was enacted after January 1, 1996. Absent some sort of clairvoyance, no appraiser, on the first day of that calendar year, would have been aware of this change in the law. From the authorities presented to me, it appears that, as of January 1, 1996, H.U.D. was authorized to approve prepayment of loans with certain conditions; however, as I read these authorities, the decision was still left to H.U.D., and there was no right of prepayment. The deed of trust here prevents conveyance or encumbrance of the subject property during the existence of the deed of trust, and the loan is not assumable.

For the foregoing reasons, I find that this property was subject to restrictions and therefore was not freely marketable. In ignoring this, the County has disregarded "controlling" evidence, and the owner has overcome the presumption of correctness. *Arlington County Bd v. Ginsberg.* Hence, I must set aside the County tax assessment value as determined by Blue Ridge Appraisals' market study.

The question now becomes what is the value of this property. In determining value, I am not required to adopt any particular appraisal, but I must make this determination upon the evidence presented. *Board of Supervisors v. Donatelli & Klein.* I do not believe that the cost approach is appropriate here because of the age of this property. For this reason, I will not deal further with the analysis under this approach made by Mr. Didawick and Mr. Gentry. Since Mr. Gentry, in his sales comparison analysis, did not make adjustments for the restrictions on the John S. Perry House, I can give little weight to this appraisal in view of my ruling herein. The information concerning Massanutten Manor, another government-regulated facility for the elderly and handicapped in Shenandoah County, was submitted into evidence, almost as an afterthought, and I am not satisfied that the comparison between the physical facilities there and those at John S. Perry House has been sufficiently developed for me to draw any valid conclusion. That leaves the income approach which, as noted above, is the preferable appraisal method for income-producing properties.

Mr. Nolan is the only one of the four appraisers who performed a discounted cash flow analysis. I reject the income figures he derived under this procedure, and I adopt those used by Mr. Didawick and Dr. Peltzer, an

appraiser from each side. Both used $260,000.00. I believe the setting of a capitalization rate is somewhat subjective. This is attested to by the wide span between the high and low rates offered in this case. I will ignore the capitalization rate used by Mr. Gentry, since he did not consider the special nature of this property in developing his appraisal. While Mr. Didawick ignored this as well, his capitalization rate is the same as that employed by Mr. Nolan, and, for that reason, I will give some weight to his determination in that regard. I have taken an average of the capitalization rates suggested by the three remaining appraisers, Mr. Didawick, Mr. Nolan, and Dr. Peltzer. I adopt the resulting figure, 12%, as the appropriate capitalization rate. Performing the math, I determine this property to have a value of $2,167,000.00 (rounded off) as of January 1, 1996.