## CIRCUIT COURT OF FAIRFAX COUNTY

Army-Navy Country Club

    v.

City of Fairfax

February 17, 2012

Case No. CL-2010-18136

BY JUDGE JANE MARUM ROUSH

This matter came on for a bench trial on December 19 through 21, 2011, on the Plaintiff's Complaint for Correction of Erroneous Assessments. At the conclusion of the trial, the court took the case under advisement. I have now thoroughly reviewed the pleadings and the exhibits entered into evidence and considered the arguments of counsel. For the reasons stated below, the court will grant the relief requested and correct the assessments for the applicable years.

### *Facts*

Plaintiff Army Navy Country Club (the "Owner") seeks correction of allegedly erroneous tax assessments for the years 2007 to 2010 of approximately 231 acres of real property it owns in the City of Fairfax (the "Property"). The Property has been used for many years as a golf course.

The City of Fairfax (the "City") assessed the Property as follows during the calendar years in issue in this case:

| Year | Value of Land | Value of Buildings and Improvements | Total Value |
|------|---------------|-------------------------------------|-------------|
| 2007 | $65,738,800 | $10,000 | $65,748,800 |
| 2008 | $65,738,800 | $10,000 | $65,748,800 |
| 2009 | $69,036,200 | $10,000 | $69,046,200 |
| 2010 | $69,036,200 | $10,000 | $69,046,200 |

At trial, the Owner's expert appraiser opined that the fair market value of the Property during the relevant years is as follows:

| Year | Value of Land | Value of Buildings and Improvements | Total Value |
|------|---------------|-------------------------------------|-------------|
| 2007 | $18,800,000 -$28,800,000 | $0 | Not more than $28,800,000 |
| 2008 | $18,800,000 -$28,800,000 | $0 | Not more than $28,800,000 |
| 2009 | $18,800,000 -$28,800,000 | $0 | Not more than $28,800,000 |
| 2010 | $18,800,000 -$28,800,000 | $0 | Not more than $28,800,000 |

At trial, the City's expert appraiser opined that the fair market value of the Property in the applicable years is as follows:

| Year | Value of Land | Value of Buildings and Improvements | Total Value |
|------|---------------|-------------------------------------|-------------|
| 2007 | $57,760,000 | $15,800,000 | $73,560,000 |
| 2008 | $57,760,000 | $14,500,000 | $72,260,000 |
| 2009 | $48,735,000 | $10,900,000 | $59,635,000 |
| 2010 | $45,125,000 | $10,400,000 | $55,525,000 |

### Discussion

The Constitution of Virginia provides that "[a]ll assessments of real estate and tangible personal property shall be at their fair market value." Va. Const., art. 10, § 2 (1971). See also Va. Code § 58.1-3201 (real property to be assessed at 100% of fair market value).

"Fair market value" of a property is the "sale price when offered for sale by one who desires, but is not obligated to sell it, and is bought by one who is under no necessity of having it." *TB Venture, L.L.C. v. Arlington County*, 280 Va. 558, 564, 701 S.E.2d 791 (2010); *Keswick Club L.P. v. County of Albemarle*, 273 Va. 128, 136, 639 S.E.2d 243 (2007) (same); *Tuckahoe Woman's Club v. Richmond*, 199 Va. 734, 737, 101 S.E.2d 571 (1958) (same).

In addition, fair market value of real property is "the *present actual value of the land* with all its adaptations to general and special uses, and not its prospective, speculative, or possible value, based on future expenditures and improvements." *Fruit Growers Express Co. v. City of Alexandria*, 216 Va. 602, 609, 221 S.E.2d 157 (1976) (emphasis in original).

A taxpayer seeking relief from an allegedly erroneous assessment has the burden of proving that the assessment exceeds fair market value. *Keswick Club, L.P. v. County of Albemarle*, 273 Va. 128, 136, 639 S.E.2d 243 (2007). In general, there is a presumption of correctness to the assessment. *Id.* The taxpayer may overcome the presumption of correctness by showing that the assessor made a manifest error or disregarded controlling evidence. *Id.* If the presumption of correctness is rebutted because the assessor has committed manifest error, the taxpayer need only show that the assessment is erroneous. An assessment is erroneous if the property is assessed at more than its fair market value. *County of Albemarle v. Keswick Club, L.P.*, 280 Va. 381, 699 S.E.2d 491 (2010). If the presumption of correctness has been rebutted and the taxpayer shows that the assessment is erroneous, the trial court then acts as the assessor in determining the fair market value of the property. Va. Code Ann. § 58.1-3987.

### Manifest Error

In this case, the Owner argues that the City's assessor committed manifest error by employing an inappropriate method in valuing the Property. See *County of Albemarle v. Keswick Club, L.P.*, 280 Va. 381, 391, 699 S.E.2d 491 ("A taxpayer may demonstrate manifest error by proving that the taxing authority employed an improper methodology in arriving at a property's assessed value."). Specifically, according to the Owner, the City's assessor erred in using the "development cost" approach to arrive at his assessment.

In *Fruit Growers Express Co. v. City of Alexandria*, 216 Va. 602, 609, 221 S.E.2d 157 (1976), the Supreme Court of Virginia disapproved of an approach to valuation of raw land that is known as the "developmental" or "development cost" approach. That approach determines the value of land by "deducting the estimated costs of developing that land to a particular use from the income expected from the sale or lease of that land when finished for such use." 216 Va. at 607. The Court opined that a "[v]aluation based on potential income which might be realized from the utilization by the owner of the property in a manner of which it is capable (but of which he has not yet availed himself) has generally been rejected on the ground that such income is too uncertain and conjectural to be acceptable." *Id.*, quoting 4 Nichols, *The Law of Eminent Domain*, § 12.312[2] (3d ed. rev. 1975).

In *Fruit Growers*, the Virginia Supreme Court quoted with approval the following passage from *Nichols on Eminent Domain*:

> [T]he owner may offer a plan showing a possible scheme of development for the purpose for which it is most available, provided it appears that the likelihood of demand for the property for that purpose is such as to affect market value. He cannot, however, go further and describe in detail to the jury a

speculative enterprise for which in his opinion (or that of some expert) the land might be used, and base his estimate of value upon the profits which he would expect to derive from the enterprise. In other words, *he cannot capitalize the projected earnings of a non-existent enterprise or projected use.* The owner cannot, for example, introduce evidence of the return that he would derive from cutting up a vacant tract of land into building lots, since this would involve pure conjecture as to how fast the lots would be sold and the price that each would bring; *and the details of a possible improvement of the land, and its value, or the expected profits or rentals after such improvement was completed are equally inadmissible,* for the same reason.

216 Va. at 608, quoting 5 Nichols, *The Law of Eminent Domain*, § 18.11[2] (3d ed. rev. 1975) (emphasis added by Supreme Court of Virginia).

The Supreme Court of Virginia, in deciding *Fruit Growers,* cited its earlier case of *Appalachian Power Co. v. Anderson,* 212 Va. 705, 187 S.E.2d 148 (1972). In that case, the owners of a tract of raw land introduced into evidence a plat that was prepared after the take, showing the land subdivided as a trailer park. The Court ruled that it was improper to value the property on a per lot basis, as the "cost factor is too speculative." 212 Va. at 711. In *Anderson,* the Court quoted with approval a North Carolina case in which the court opined:

It is proper to show that a particular tract of land is suitable and available for division into lots and is valuable for that purpose, but it is not proper to show the number and value of lots as separated parcels in an imaginary subdivision thereof. In other words, it is not proper for the jury in these cases to consider an undeveloped tract of land as though a subdivision thereon is an accomplished fact. *Such undeveloped property may not be valued on a per lot basis. The cost factor is too speculative.*

*Anderson, supra,* at 711, citing *Barnes v. North Carolina State Highway Commission,* 250 N.C. 378, 388-89, 109 S.E.2d 219, 228 (1959) (emphasis added).

At trial, Tom Reed was called as an adverse witness by the Owner. Mr. Reed testified that he became the City's assessor 2009. He prepared the 2010 assessment for the Property using the same methodology that the City had used for the previous twenty years when valuing the Property. He acknowledged that the City used the development approach in assessing the Property. He testified that "we work off a subdivision hypothetical" that

"assume[s] a number of lots" and "assign[s] a value to each one of those lots."

Elaborating on his 2010 assessment of the Property, Mr. Reed testified that he assumed that the Property would yield 144 lots in an R-1 zoning area, and 308 lots in an R-2 zoning area. He valued the R-1 lots at $310,000 each and the R-2 lots at $285,000 each. He reduced those values by 47.5% to account for development costs (40%) and absorption (7.5%). He did not prepare a detailed cost breakdown to arrive at the 40% development costs. He assumed that the 452 lots would be absorbed (i.e., sold) as finished, retail lots to builders over a four-year period. Mr. Reed's methodology in preparing the 2010 assessment is summarized in his letter to the Owner admitted as Plaintiff's Ex. # 6. Mr. Reed did not examine any engineering study to determine if the Property would, in fact, yield 452 lots. The City has since commissioned a professional engineer to prepare a subdivision layout. That study projected that the Property would yield 361 lots.

Mr. Reed testified that the City had used the development approach for a long time, including all of the tax years in question in this suit.

The court concludes that the Owner has shown, by a preponderance of the evidence, that the City's assessments are a result of manifest error for all of the tax years in question. The City clearly used the development approach method, which is improper for the reasons stated in *Fruit Growers* and *Anderson*.

In addition, the City's assessment is not entitled to the presumption of correctness because its assessors used only the development approach to value the Property for the four tax years at issue in this case. In *Keswick Club, L.P. v. County of Albemarle*, 273 Va. 128, 639 S.E.2d 243 (2007), the Supreme Court held that, "[i]n cases where a taxing authority bases an assessment of fair market value solely on one approach in determining that fair market value of property, the resulting assessment is entitled to the presumption of validity so long as the taxing authority considers and properly rejects the other valuation methods." *Id*. at 137 (internal quotation marks omitted). In this case, the City made no effort to consider other approaches to valuation. For that reason, the assessments are not presumed to be correct.

In that the assessments are the result of manifest error, the presumption of correctness has been rebutted. The Owner has the burden of showing that the assessments are erroneous.

### Erroneous Assessment

As stated above, a taxpayer may show that an assessment is erroneous if it is at more than fair market value.

Laurence A. Hirsh testified at trial as an expert appraiser for the Owner. Mr. Hirsh is the president of Golf Property Analysts. He is a real estate appraiser, licensed in Virginia, who specializes in golf courses. Using the

income approach, the sales comparison approach, and the development approach, he appraised the Property both as an operating golf club and as a site for future development.

Mr. Hirsh concluded that the highest and best use for the Property is as a site for residential development. The Property can be developed as a matter of right for residential purposes. In other words, no rezoning would be required for the Property to be subdivided into housing lots.

After considering three methods or approaches to valuation, ultimately he based his valuation on the sales comparison approach. He researched over 100 large parcels of land suitable for residential development that were sold in the tax years in question. He selected nine sales that he considered comparable. See Plaintiff's Exs. ## 34 and 35. The sales were located in Fairfax, Loudoun, and Prince William counties in Virginia and in Montgomery County, Maryland.

Mr. Hirsh testified that, because of the fact that there were few comparable sales during the applicable period, the data was "scattered." As a result, he was unable to opine on a precise value for the Property. He could opine, to a reasonable degree of certainty in his field, that the Property was worth between $80,000 to $120,000 per acre, or $18,800,000 to $28,800,000. He testified that he could not be more specific in light of the paucity of comparable sales. He concluded that the Property was worth "not more than" $28,800,000 for any of the applicable tax years.

In its case in chief, the City presented two expert witnesses. First, Theodore Britt, a civil engineer, testified that he prepared a subdivision plan for the Property and, in his expert opinion, the Property would yield 361 residential lots.

Oakleigh Thorne was the City's expert appraiser who testified at trial. He has been an appraiser for forty-six years. He specializes in raw land appraisals and has experience in appraising golf courses.

Mr. Thorne agreed with Mr. Hirsh that the highest and best use of the Property for all the tax years in question was as a site for residential development, rather than as a golf course. He also agreed with Mr. Hirsh that it was difficult to find comparable sales.

Mr. Thorne looked at thirty to forty land sales in the region. He ultimately selected five sales that he felt were comparable to the Property. He valued the land as being worth $57,760,000 in 2007, $57,760,000 in 2008, $48,735,000 in 2009, and $45,125,000 in 2010. To these values, Mr. Thorne added the value of the existing clubhouse on the Property. The clubhouse is approximately 26,000 square feet. It has a kitchen, a grill room, a restaurant, locker rooms, and a pro shop. Mr. Thorne opined that the clubhouse would be a major amenity for a residential subdivision on the Property. He used the cost approach to value the clubhouse. Mr. Thorne valued the clubhouse as being worth $15,800,000 in 2007, $14,500,000 in 2008, $10,900,000 in 2009, and $10,400,000 in 2010.

Adding the value of the land to the value of the clubhouse, Mr. Thorne concluded that the value of the Property was $73,560,000 in 2007, $72,260,000 in 2008, $59,635,000 in 2009, and $55,525,000 in 2010.

Mr. Thorne made no attempt to defend the assessments. Comparing his values to the assessments, Mr. Thorne opined that the Property was under-assessed in 2007 by $7,811,200, under-assessed in 2008 by $6,511,200, over-assessed in 2009 by $9,411,200, and over-assessed in 2010 by $13,521,200.

### Discussion

To determine whether the Owner has proven by a preponderance of the evidence that the assessments were erroneous, the court must, of course, evaluate the credibility of the witnesses.

The court will not recount here in detail the extensive testimony of the parties' experts. Over the course of the three-day trial, each expert admitted to some errors in his interpretation of a detail of a comparable sale. None of these errors, however, had a significant effect on the expert's ultimate opinion as to fair market value.

Having observed the witnesses and their demeanors, the court concludes that, in general, Mr. Hirsh's opinions as to value were more credible than the City's expert.

Mr. Hirsh cast a broader net in finding comparable sales. His adjustments to account for differences between the comparable sales and the subject Property were less severe. For example, Mr. Hirsh considered no properties smaller than 100 acres. In contrast, Mr. Thorne's comparable sales included a parcel as small as four acres, although in close proximity to the Property.

Mr. Hirsh's comparable sales were each under contract or closed prior to the tax year in question. Mr. Thorne used the same five comparable sales for each of the tax years. One of the comparable sales closed in 2008, two closed in 2009 and one closed in 2010. Therefore, in many instances, the comparable sale came after the effective date of the assessment, which is January 1 for the applicable tax year. To illustrate, one of Mr. Thorne's five comparable sales closed on December 26, 2010. Therefore, that sale was one to four years after the effective date of the valuation for each of the tax years at issue in this case.

In appraisal practice, it is preferable to select as comparable sales "properties similar to the subject property that have recently been sold, are listed for sale, or are under contract, i.e., for which purchase offers and a deposit have been recently submitted." Appraisal Institute, The *Appraisal of Real Estate* 397 (11th ed. 1996). This preference is due to the fact that a hypothetical purchaser acquiring the property on the effective date of the valuation would not know of later sales and contracts and thus they would not affect his or her decision as to value. The Uniform Standards of

Professional Appraisal Practice ("USPAP")[1] recommend that, in the case of a retrospective appraisal (i.e., one conducted after the effective date of the valuation), sales subsequent to the effective date of the appraisal be used sparingly. "In the absence of evidence in the market that the data subsequent to the effective date were consistent with and confirmed market expectations as of the effective date, the effective date should be used as the cut-off date for data considered by the appraiser." USPAP, Statement on Appraisal Standards No. 2 (SMT-2) (2012-13 ed.).

Therefore, the court concludes that Mr. Hirsh's approach to consider as comparable sales only transactions that were closed or under contract as of January 1 of the applicable tax year to be more consistent with sound appraisal practices than Mr. Thorne's selection of significantly later sales.

Perhaps the most significant divergence between the experts is the value, if any, to be ascribed to the existing clubhouse on the Property. The City's assessors assigned a nominal value of $10,000 to the clubhouse for the four tax years under review. Mr. Hirsh, the Owner's expert appraiser, assigned it no value. In his opinion, the clubhouse was valueless to any developer of a subdivision on the Property. A 26,000 square foot clubhouse would not be needed for a housing development that had no golf course. The cost of operating such a large clubhouse would be prohibitive for the developer or a future homeowners' association. In Mr. Hirsh's experience, when a golf course is sold for residential development, the clubhouse is usually demolished. He assigned no value to the presence of the clubhouse and assigned no negative value to account for demolition costs.

Mr. Thorne, the City's expert, opined that the clubhouse was a major amenity for the Property, one that added $10,400,000 to $15,800,000 to the value of the Property. He opined that a developer would pay that amount, in addition to the value of the land, in order to acquire the bricks and mortar of the clubhouse. The developer could then recoup the cost by charging a premium of $33,000 per lot sold.

In rebuttal, the Owner called Bruce Gould as a witness. Mr. Gould is an experienced real estate developer who has established and operated homeowners' associations. In his opinion, the existing clubhouse is "way too big" for a subdivision of the size projected for the Property. The premium that the developer would pay for the clubhouse would have to be

---

1. The Uniform Standards of Professional Appraisal Practice (USPAP) are the generally accepted standards for professional appraisal practice in North America. USPAP contains standards for all types of appraisal services. Standards are included for real estate, personal property, business, and mass appraisal. The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 recognizes USPAP as the generally accepted appraisal standards and requires USPAP compliance for appraisers in federally related transactions. State Appraiser Certification and Licensing Boards; federal, state, and local agencies, appraisal services; and appraisal trade associations require compliance with USPAP. See http://www.appaisalfoundation.org, last accessed February 16, 2012. The Virginia Real Estate Appraiser Board requires appraisers licensed in Virginia to comply with USPAP.

passed on to the purchasers of the lots and would add $28,800 to $43,000 to the cost of each lot, depending on the year in question. In addition, the costs of maintaining and operating the clubhouse would make the monthly homeowner association dues too high for the market. A clubhouse this big would, in his view, be a negative for the community. Mr. Gould testified that, if he were developing the Property, he would tear down the clubhouse and build a new clubhouse of less than 4,000 square feet.

As the fact finder, the court agrees with the Owner's experts that the existing clubhouse consisting of 26,000 square feet and including a kitchen, a restaurant, a grill room, locker rooms, a pro shop, etc., would not be a significant amenity for any residential community that might be developed on the Property. It most certainly is not an amenity that increased the value of the Property by $10,400,000 to $15,800,000 for the tax years 2007 to 2010. The court very much doubts that purchasers of the finished lots will be willing to pay a premium of $28,800 to $43,000 per lot because of the existence of the clubhouse. The court agrees that the clubhouse is most likely a negative for the Property. The court concludes that Mr. Hirsh's approach, of assigning no value, whether positive or negative, to the clubhouse is more sound than Mr. Thorne's approach of treating the clubhouse as a valuable amenity for the Property.

Finally, the court has given less weight to Mr. Thorne's appraisal because the court shares the Owner's view that Mr. Thorne's appraisal is based on the disfavored development approach. Mr. Thorne admits to using the development approach as a "secondary unit of comparison." He expressed the values of his comparable sales on both a "per square foot" and a "per lot" basis. Nevertheless, the values he arrives at can only be explained by multiplying the number of lots Mr. Britt projected for the Property, 361, by a per lot value. See, e.g., Defendant's Ex. # 14. This is the development approach that was criticized by the Supreme Court of Virginia in *Fruit Growers* and *Anderson*.

The City is critical of Mr. Hirsh's appraisal because he expressed his opinion as to valuation as a range of values, which is inappropriate for valuations for purposes of real estate taxation. A "point estimate" of value is generally required for real estate taxation purposes. The Appraisal Institute, *The Appraisal of Real Estate*, 564 (13th ed. 2008). This requirement makes sense, as a tax bill is typically expressed as the tax rate multiplied by each $100 of assessed value. USPAP permits an appraisal to be expressed as a range of values. In the comment to USPAP's definition of "appraisal," it is noted that "an appraisal must be numerically expressed as a specific amount, as a range of numbers, or as a relationship (e.g., not more than, not less than) to a previous value opinion or numerical benchmark (e.g., assessed value, collateral value)." *Uniform Standards of Professional Appraisal Practice* (2012-13 ed.), at U-1. Mr. Hirsh opined that the Property was worth not

more than $28,800,000 in each of the applicable tax years. A "not more than" opinion as to value complies with USPAP.

*Conclusion*

Va. Code § 58.1-3987 provides as follows:

> If the court is satisfied from the evidence that the assessment is erroneous . . . the court may order that the assessment be corrected and that the applicant be exonerated from the payment of so much as is erroneously charged, if not already paid. If the tax has been paid, the court shall order that it be refunded to the taxpayer, with interest at the rate provided by § 58.1-3918 or in the ordinance authorized by § 58.1-3916, or as otherwise authorized in that section.
>
> If, in the opinion of the court, any property is valued for taxation at more than fair market value, the court may reduce the assessment to what in its opinion based on the evidence is the fair market value of the property involved. If, in the opinion of the court, the assessment be less than fair market value, the court shall order it increased to what in its opinion is the fair market value of the property involved and shall order that the applicant pay the proper taxes.
>
> For the purpose of reducing or increasing the assessment and adjusting the taxes, the court shall have all the powers and duties of the authority which made the assessment complained of, as of the time when such assessment was made, and all powers and duties conferred by law upon such authority between the time such assessment was made and the time such application is heard.

Virginia Code Ann. § 58.1-3987.

Having considered all of the evidence in the case, the court concludes that the Property was assessed at over its fair market value for the years 2007 to 2010. The court will correct the assessment to $28,800,000 for those years and order that the Owner be refunded any taxes paid attributable to the over-assessment. If the full tax bill has not been paid for any of the years in question, the Owner shall be exonerated from the payment of so much as the Owner was erroneously charged.

REPORTER'S NOTE: Earlier proceedings in this case are reported at 84 Va. Cir. 60; this case is cited in *IPROC Norfolk, L.L.C. v. City of Norfolk* (2013), which is printed below at page 435.