# CIRCUIT COURT OF AUGUSTA COUNTY

Staunton Mall
Realty Management, L.L.C.

v.

Augusta County
Board of Supervisors

July 8, 2015

Case No. CL13002412-00

BY JUDGE VICTOR V. LUDWIG

Without attempting to recite in detail the procedural history of this case, I note that, on December 31, 2013, Staunton Mall Realty Management, L.L.C. (Staunton Mall), filed a Complaint for Correction of Erroneous Assessment of Real Estate (the Complaint), asking that the Court correct the assessment for the years 2010 through 2013. The defendant, Augusta County, filed an answer asking that the Complaint be dismissed.

The parties presented evidence on March 3, 2015, and the final brief in the matter was filed on April 14. In addition, the parties stipulated that Staunton Mall acquired the assessed real estate (the Property or the Mall) in September 2010 and that it paid taxes for the second half of 2010 and the taxes for all of the tax years 2011 through 2013. In addition, the parties stipulated that:

1. The Property consists of two parcels, the Mall Parcel and the Belk Parcel.

2. Blue Ridge Mass Appraisal Company (BRMAC) completed the assessment of the Property in 2009, for a five-year cycle, with the valuation effective January 1, 2009. (BRMAC assessed the Property at $21,077,000.00, and the method by which that number was calculated was the topic of considerable discussion at trial.)

3. The initial assessments were predicated "primarily" on a "valuation-formula-based approach," which derives values of components from the Marshall and Swift cost guide and assigns values to the components (the details of which are described fully in the stipulation).

4. The initial assessments were reduced by the Board of Equalization.

5. The final assessment for the Mall Parcel was $17,066,800.00, and the final assessment for the Belk Parcel was $2,238,700.00, for a total assessment of the Property of $19,305,500.00 (and I will generally refer to the "assessment," without further allocating the total assessment to the individual parcels).

6. William Morris Bender, the expert employed by Staunton Mall, valued the Property at $6,400,000.00.

I. *Applicable Law*

The issue in *City of Martinsville v. Commonwealth Boulevard Assoc., L.L.C.,* 268 Va. 697 (2004) (cited by both parties), was "whether a taxpayer is entitled to relief under Code § 58.1-3984 for real estate taxes erroneously

assessed during the interim between general reassessments. More specifically, may the taxpayer challenge an annual levy of taxes without showing that the previous general reassessment, upon which the annual levy was based, was erroneous? We answer the question in the affirmative." *Id.* at 698. The result of that holding is that the taxpayer may attack an assessment, good at the time it was made, if it does not reflect fair market value at the time of the annual levy. However:

> [T]here shall be a presumption that the valuation determined by the assessor or as adjusted by the board of equalization is correct. The burden of proof shall be on the taxpayer to rebut such presumption and show by a preponderance of the evidence that the property in question is valued at more than its fair market value or that the assessment is not uniform in its application, and that it was not arrived at in accordance with generally accepted appraisal practices . . . . Mistakes of fact, including computation, that affect the assessment shall be deemed not to be in accordance with generally accepted appraisal practice.

Va. Code § 58.1-3984. *City of Martinsville* was decided prior to the statute having been amended in 2011. The evidence was that the biennial assessment, effective from July 1, 1999, through June 31, 2001, was $12,408,700.00. However, on December 3, 1999, the then-owner filed for bankruptcy protection. A year later, by which time the property was "vacant and 'essentially gutted,'" *id.* at 699, an appraisal conducted for a purchaser in bankruptcy (CBA) valued the property at $2,375,000.00, and on January 4, 2001, the purchaser paid $750,000.00 for it. Four days prior to the sale, in assessing the property for the next biennium (beginning July 2001), the City assessed the property at $4,128,386.00. Disposing of CBA's allegation that this was an erroneous assessment pursuant to Virginia Code § 53.1-3984, the Court reduced the assessment for the first half of 2001 to $2,375,000.00. As I note below, the language of Virginia Code § 53.1-3984 was amended in a significant way in 2011, but the change does not affect the precise holding of *City of Martinsville.*

The City's only contention was "that annual levies of taxes must be based only on valuations established by the previous general reassessment, and that, with certain exceptions not pertinent here, a taxpayer seeking relief from taxes levied in the interim must prove that the previous general reassessment was erroneous when originally made." *Id.* "CBA contended only that the annual levy for the first half of 2001, based on the 1999 valuation of $12.4 million, was clearly erroneous based on the City's own valuation of $4.1 million as of January 1, 2001 and the independent appraisal of $2.3 million made the previous month." *Id.* at 699-700.

In addressing the only issue before it, and relying on the precedent of *Hoffman v. County of Augusta,* 206 Va. 799 (1966), the Court narrowly held:

> A taxpayer is entitled to relief under Code § 58.1-3984 if he carries his burden of proving that in either the general reassessment or in the annual levy of taxes "the property in question is valued at more than its fair market value or that the assessment is not uniform in its application, or that the assessment is otherwise invalid or illegal." Code § 58.1-3984.

*Id.* at 700. In *Hoffman,* the Court made it clear that the term "assessment" as used in the Code is susceptible of two meanings. First, it is the value assigned to real property at the time of the general reassessment. Second, it is the assessment of taxes on an annual basis, which is predicated on the value assigned by the reassessment, subject to statutorily approved changes (or as corrected by a court), multiplied by the tax rate. The Court then deferred to the trial court's factual conclusion, "on conflicting evidence of value," that the assessment for the first half of 2001 was more than the fair market value of the property. Implicit in that holding is that the Court approved the conclusion of the trial court that CBA had successfully borne its burden of proof to rebut the "presumption that the valuation determined by the assessor . . . [was] correct." Va. Code § 58.1-3984. In that case, of course, the trial court was confronted with (a) one assessment that was made when the property was an active manufacturing plant, (b) another appraisal made when the property was "vacant and 'essentially gutted,'" (c) a purchase price far below both of those values, and (d) a new assessment by the County, to be effective six months after the relevant tax period, which was approximately a third of its previous assessment.

Although *City of Martinsville* is instructive (indeed, controlling) on the issue that was before the Supreme Court (*i.e.,* "whether a taxpayer can challenge an annual levy without showing that the previous general reassessment . . . was erroneous"), it is not dispositive of (or even particularly enlightening as to) the case at bar as to the trial court's factual findings.

I recognize that the trial court had an appraisal in bankruptcy and a sale in bankruptcy, and that the pending case has a sale in bankruptcy. However, the record does not disclose what weight the trial court gave to the forced sale. Indeed, it appeared to have accepted the appraisal of the vacant property, perhaps corroborated by the County's own assessment shortly thereafter.

In *West Creek Associates, L.L.C. v. County of Goochland,* 276 Va. 393 (2008) (also cited by both parties), 144 separate limited liability companies (collectively, West Creek) sought relief from a quadrennial reassessment by which the County assessed 2,500 acres as 144 separate parcels (collectively, the Property). West Creek asserted that the assessments "exceeded the fair

market value of the Property and [were] invalid . . . [and] that the County's assessments were not uniform in their applications and that the County disregarded controlling evidence in making the assessments." *Id.* at 399. The trial court referred to the presumption in favor of the assessment and concluded that "the taxpayer must show manifest error in the manner of making the estimate, or that evidence which should be controlling has been disregarded." *Id.* at 403. Amplifying that, the trial court concluded that, to establish manifest error, the taxpayer could not rely simply on evidence of differing opinions as to fair market value; rather, "a taxpayer must present evidence establishing what information the taxing authority considered and how it arrived at the assessment in question." *Id.* at 407

Although there were two categories of parcels under consideration (which, in the event, yielded different results in the trial court), the Supreme Court noted:

> The primary issue concerns whether a taxpayer must prove manifest error in the "manner" in which a taxing authority arrived at the assessed value of real property or whether a taxpayer can prevail by proving a sufficient disparity[1] between the assessed value of real property and its fair market value. Because we conclude the circuit court erred by holding that, in order to show manifest error, a taxpayer must prove what information the taxing authority considered and how it arrived at the assessment in question, we will reverse that portion of the circuit court's judgment sustaining a motion to strike the evidence with regard to certain parcels.

*Id.* at 397.

At the outset of its analysis, the Court articulated the basic framework that governs cases of this nature, and, although I appreciate that long quotations are generally disfavored, in an area as complex as this, it may be preferable to have the core principles set out in one place:

> We begin our analysis by repeating the well-established principles that guide our review of a circuit court's judgment upholding a taxing authority's assessment of the fair market value of real property. A taxing authority's assessment is presumed to be correct, and a taxpayer has the burden to rebut that presumption by establishing that the real property in question is assessed at more than fair market value or that the assessment is not uniform in its application. Code § 58.1-

---

[1] The Court appears to use the adjectives "sufficient" and "significant" interchangeably when describing the level of disparity that the taxpayer must demonstrate. I will adopt "sufficient" unless it appears otherwise in a citation.

3984(A).[1] "The effect of this presumption is that even if the assessor is unable to come forward with evidence to prove the correctness of the assessment this does not impeach it since the taxpayer has the burden of proving the assessment erroneous.'" [Citations omitted.] We have held that a taxpayer must show by a clear preponderance of the evidence that the taxing authority committed manifest error or totally disregarded controlling evidence in making the assessment.

*Id.* at 409 (citations omitted). And finally, "[i]n order to satisfy the statutory requirement of showing that real property is assessed at more than its fair market value . . . a taxpayer must necessarily establish the property's fair market value." *Id.* at 417.

Organizing those principles in the order a trial court must consider them, it is clear that:

1. There is a presumption that the assessment is correct,

2. The taxpayer must establish the property's fair market value. In some cases, the taxpayer simply did not pass this threshold requirement. (Indeed, as to the second category of parcels, that was true in *West Creek Associates; see also City of Richmond v. Jackson Ward Partners, L.P.*, 284 Va. 8 (2012); *TB Venture, L.L.C. v. Arlington County*, 280 Va. 558 (2010).

3. Having established the fair market value, the taxpayer has the burden to rebut the presumption either by proving:

    a. that the real property is assessed at more than fair market value, or

    b. that the assessment is not uniform.

4. The taxpayer may meet the burden of 3.a. only by proving, by a clear preponderance of the evidence, that:

    a. the taxing authority committed manifest error, or

    b. that the taxing authority totally disregarded controlling evidence.

5. Even if the assessor is unable to prove the correctness of the assessment, this does not impeach it because the taxpayer has the burden of proving the assessment erroneous.

With those observations, the Court then focused on the "initial issue" to decide, being "the legal dispute between the parties regarding the means by which a taxpayer can show manifest error by a taxing authority in assessing the fair market value of real property." *West Creek Assoc.*, 276 Va. at 409-10. West Creek argued that "a taxpayer can establish manifest error by proving a sufficient disparity between the assessed value of real property and its fair market value." *Id.* at 410. The County maintained that "a taxpayer must prove manifest error in the taxing authority's methodology and that a mere difference of opinion as to fair market value is insufficient to overcome

---

[1] As I noted earlier, this statute, which is central to these cases, was amended in 2011, shortly after this case was decided, and, I suggest, in response to it. *See* 2011 Acts chs. 184, 232.

the presumption of correctness afforded an assessment." *Id.* Amplifying that argument, the County maintained that the taxpayer must prove "'what methodology was used, how it was applied, what factual information was available to the assessing authority when making the assessments, how that information was considered and/or what weight it was given, and what information was disregarded.'" *Id.* Then, according to the County, a taxpayer must identify the alleged error in the taxing authority's methodology." *Id.* The Court then briefly reviewed (a) a series of its cases on which the County relied to support its assertion, (b) other cases in which the holdings "turned on whether the taxing authority had employed an improper methodology in determining fair market value," *id.* at 412, and (c) still others in which the holdings were grounded "on nothing more than conflicting evidence of fair market value and whether the taxpayer had demonstrated that the real property at issue was assessed at more than fair market value." *Id.* at 413.

Having carefully considered all of its (somewhat conflicting) precedent, the Court concluded:

> This survey of the Court's decisions leads to the conclusion that the circuit court erred by holding that, in order to show manifest error, a taxpayer must prove what information the taxing authority considered and how it arrived at the assessment in question, *i.e.*, its methodology. It is correct that, in the majority of our cases, the dispositive issue was whether the taxing authority had utilized an improper methodology in setting the assessed value of real property. But, *we have never explicitly held that manifest error cannot be established simply by evidence showing that real property is assessed at more than its fair market value.* In all cases, however, a taxing authority's assessment is presumed to be correct, *Keswick Club*, 273 Va. at 136, 639 S.E.2d at 247, and the taxpayer has the burden of proof "to show that the property in question is valued at more than its fair market value or that the assessment is not uniform in its application, or that the assessment is otherwise invalid or illegal." Code § 58.1-3984(A).

*Id.* at 413-14 (emphasis added).

What the Court did was expressly reverse the trial court's conclusion that "in order to show manifest error, a taxpayer must prove what information the taxing authority considered and how it arrived at the assessment in question, *i.e.*, its methodology." *Id.* at 413. Having rejected the trial court's standard, the Supreme Court then implicitly adopted the more lenient standard that manifest error could be established simply by evidence showing that real property is assessed at more than its fair market value. To be sure, the more lenient standard was stiffened by the requirement that "[w]hen a taxpayer attempts to prove manifest error solely by showing a

significant disparity between fair market value and assessed value without showing that the taxing authority employed an improper methodology in arriving at the property's assessed value, the taxpayer cannot prevail 'so long as the assessment comes within the range of a reasonable difference of opinion . . . when considered in light of the presumption in its favor.'" *Id.* at 414 (citations omitted).

With that holding, the Supreme Court added another (or clarified an existing) principle, adding to the five principles described above, to guide circuit courts in deciding these cases:

6. If a taxpayer seeks to prove manifest error under 4.a. solely by showing a sufficient disparity between fair market value and assessed value without showing that the taxing authority employed an improper methodology, the taxpayer cannot prevail if the assessment falls within a range of a reasonable difference of opinion.

Although the general principles announced or affirmed in *West Creek Associates* continue to guide trial courts in cases such as this one, the continued vitality of that discrete holding in the case must be gauged by a comparison of the statutory context in which it was decided and the current statute. In 2011, the General Assembly amended the statute to provide as follows (and I have noted the changes in the statute in the fashion adopted by the Acts of Assembly):

> A. . . . In such *proceedings, except for proceedings seeking relief from real property taxes,* the burden of proof shall be upon the taxpayer to show that the property in question is valued at more than its fair market value or that the assessment is not uniform in its application, or that the assessment is otherwise invalid or illegal, but it shall not be necessary for the taxpayer to show that intentional, systematic and willful discrimination has been made.
>
> *All* proceedings *pursuant to this section* shall be conducted as an action at law before the court, sitting without a jury. The county or city attorney, or if none, the attorney for the Commonwealth, shall defend the application.
>
> B. *In circuit court proceedings to seek relief from real property taxes, there shall be a presumption that the valuation determined by the assessor or as adjusted by the board of equalization is correct. The burden of proof shall be on the taxpayer to rebut such presumption and show by a preponderance of the evidence that the property in question is valued at more than its fair market value or that the assessment is not uniform in its application, and that it was not arrived at in accordance with generally accepted appraisal practices, procedures, rules, and standards as prescribed by nationally recognized professional appraisal organizations*

*such as the International Association of Assessing Officers (IAAO) and applicable Virginia law relating to valuation of property. Mistakes of fact, including computation, that affect the assessment shall be deemed not to be in accordance with generally accepted appraisal practice.*

Va. Code § 58.1-3984; 2011 Acts chs. 184, 232. By this amendment, the General Assembly removed the issue of real estate assessments from paragraph A of the statute and placed it in a paragraph relating only to real estate. Of more consequence, the legislature amended the burden that the taxpayer must bear in order to rebut the presumption, specifically addressing what the Supreme Court had never "explicitly held." A comparison of the statute as it appeared when the Court rendered the decision in *West Creek Associates* with the current statute follows.

Virginia Code § 58.1-3984(A), as construed by *West Creek Associates:*

In such proceeding, the burden of proof shall be upon the taxpayer to show that the property in question is *valued at more than its fair market value or* that the assessment is *not uniform in its application, or* that the assessment is *otherwise invalid or illegal . . . .*

Virginia Code § 58.1-3984(B), as it currently appears in the Code:

In circuit court proceedings to seek relief from real property taxes, there shall be a presumption that the valuation determined by the assessor or as adjusted by the board of equalization is correct. The burden of proof shall be on the taxpayer to rebut such presumption and show by a preponderance of the evidence that the property in question is *valued at more than its fair market value or* that the assessment is *not uniform in its application, and* that it was *not arrived at in accordance with generally accepted appraisal practices . . . .*

In order to rebut the presumption regarding the valuation of the property, the amended statute requires that the taxpayer prove, (a) that the property is valued at more than its fair market value, *or* (b) that the assessment is not uniform, *and,* in either event, the taxpayer must also prove (c) that the value or the assessment was not arrived at in accordance with generally accepted appraisal practices. I come to that conclusion because of the grammatical construction of the sentence and the timing of the amendment in relation to the decision in *West Creek Associates*.

The sole comma in the listing of requirements is neither a conventional comma nor an Oxford comma separating a series of items of equal dignity, evidenced by the fact that it only separates the third requirement from

the first two. The conclusion that the third requirement applies to each of the two preceding requirements is made clear by the fact that there is no comma separating the first two requirements, which are in the disjunctive, so they are of equal stature, and the taxpayer must prove one or the other. Were there no comma, the third requirement could apply only to the second requirement, but by separating it from the first two requirements by a comma, the General Assembly adopted a grammatical construction of "(A or B) and C." Finally, the fact that the statute was amended after the decision in *West Creek Associates* lends credence to the proposition that the General Assembly was reacting to that decision. The added paragraph, relating solely to real estate assessments, (a) appears to be a direct response to the Court's recognition that its earlier decisions at least implied that any rebuttal of the presumption required evidence that the assessor used an improper methodology in setting the assessed value of real property, but (b) also appears to be in direct response to the Court's rejection (by negative implication) of that proposition by its assertion that it had not "explicitly held that manifest error cannot be established simply by evidence showing that real property is assessed at more than its fair market value."

The result of the 2011 amendment is that what the Court explicitly declined to require, the statute now does. The amendment makes it clear that, despite evidence presented by the taxpayer that the property is valued at more than its fair market value, the taxpayer now must also show that the valuation of the taxing authority was not in accordance with generally accepted practices.[1] Given the fact that the taxpayer must now show that the methodology used by the assessor was flawed, one must then question the added principle articulated in *West Creek Associates* that if a taxpayer seeks to prove manifest error solely by showing a sufficient disparity between fair market value and assessed value without showing that the taxing authority employed an improper methodology, the taxpayer cannot prevail if the assessment falls within a range of a reasonable difference of opinion (with the negative implication that he can prevail if the assessment is outside the range of a reasonable difference of opinion). That is so because the amendment makes it clear that it is no longer an option for the taxpayer to prove manifest error solely by showing a sufficient disparity between

---

[1] I am aware that there is a potential constitutional question regarding the requirement that the methodology of the assessment be considered. *See City of Richmond v. Jackson Ward Partners, L.P.*, 284 Va. 8, 27 (2012) (McClanahan, J., dissenting); *Commonwealth v. Doe*, 278 Va. 223, 229 (2009) (recognizing that "courts have a duty when construing a statute to avoid any conflict with the Constitution"). My response is that the requirement imposed by statute does not jeopardize the taxpayer's constitutional right to a just valuation of property at its fair market value; rather, it is only an evidentiary hurdle for the taxpayer to overcome to rebut the presumption that the assessment by the taxing authority is correct.

fair market value and assessed value without also showing that the taxing authority employed an improper methodology.

*West Creek Associates* has been cited as controlling or instructive in six tax assessment cases since it was decided. None has addressed the reformatting of the statute or the change in its language. Moreover, none has applied the amended statute to tax years beginning in 2012, the first full calendar year that the amended statute would have been effective. Both *Vienna Metro, L.L.C. v. Board of Supervisors,* 86 Va. Cir. 421 (Fairfax Cnty. 2013), and *IPROC Norfolk, L.L.C. v. City of Norfolk,* 86 Va. Cir. 435 (Norfolk City 2013), involved multiple tax years, the last being 2011.

## II. *Did Staunton Mall Carry Its Initial Burden of Proof To Prove Fair Market Value?*

### A. *Evidence Offered by Staunton Mall To Establish Fair Market Value*

Mike Kohen is the managing member of Staunton Mall, an entity the sole purpose of which was to own and manage the Property. (Tr. of Proceedings 32-33 Mar. 3, 2015.) Kohen testified that he was in the business of buying "distressed properties all over the country and [trying] to revitalize them . . . commercial properties or shopping malls . . . on the verge of . . . losing tenants and — and becoming vacant." (Tr. at 33.) In an effort to rehabilitate the properties, Kohen testified that he tried "to be a little more creative — by generating some events into the mall to increase the traffic, to try to work with the tenants in terms of giving them more concession . . . ." (Tr. at 34.) He acknowledged that, with the change in shopping styles and marketing techniques, "some of them . . . I could not revive . . . . And that's what happened with Staunton Mall." (Tr. at 35-36.)

Kohen testified that he bought the Property at an auction in Atlanta, Georgia, for his high bid of $4,050,000.00. (Tr. at 36.) In the process of performing the somewhat limited due diligence open to him, he discovered that some tenants were declaring bankruptcy and others were about to leave, and "this is the nature of the business that I do." (Tr. at 37.) He knew, too, that he would have to address deferred maintenance, that he would have to renegotiate rents with the tenants, give some of them incentives to remain, and attempt to identify some local tenants. Shortly after Kohen purchased the Property, he learned that the theatre was going to vacate, which he anticipated would have an impact on other tenants. (Tr. at 43-44.) As a consequence, he attempted to operate the theatre, but without significant success, at a loss of $200,000.00. (Tr. at 49.)

Exacerbating all of the other difficulties, with reduced rents (sometimes with concessions to percentage rent alone, with no base rent), Kohen had to deal with taxes, payroll, maintenance, and utilities. Indeed, after he purchased the Property, Kohen learned that one electric meter had not been

timely read, resulting in a charge of $250,000.00. (Tr. at 46.) Couple that with the facts that (a) there was a competing shopping center that attracted one of the Property's significant tenants, (b) another tenant exercised its right to convert its rent structure from base rent to percentage rent only (reducing its monthly rent by $7,000.00), and (c) yet another tenant, whom Kohen believed to have been paying a monthly rent of $25,000.00 was, in fact, paying but $9,000.00. (Tr. at 47-48.)

Bender, having been qualified as an expert to render an opinion on the value of the Property, testified that he prepared an appraisal report dated October 2, 2014, which was based on a physical examination of the Property, an analysis of the market, the operating history of the Mall, including "income statements, rent — the current rent roll, those types of things." (Tr. at 76.) The purpose of the appraisal was to determine the market value of the Property as defined on page 2 of his appraisal (P. Ex. 13), which definition is:

> The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
> 1. buyer and seller are typically motivated;
> 2. both parties are well-informed or well-advised, and acting in what they consider their best interests;
> 3. a reasonable time is allowed for exposure in the open market;
> 4. payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and
> 5. the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

Regardless of the standards articulating the requirements for the appraiser, the Supreme Court of Virginia has generally defined the term "fair market value" as a "sale price when offered for sale 'by one who desires, but is not obliged, to sell it, and is bought by one who is under no necessity of having it.'" *Keswick Club, L.P. v. County of Albemarle*, 273 Va. 128, 136 (2007) (quoting *Tuckahoe Woman's Club v. City of Richmond*, 199 Va. 734, 737 ((1958)).

In response to the question whether he "orient[ed his] task here to jurisdictional exception, namely the fact that it's in Virginia," Bender refined the definition (with less than comforting clarity) with the following observation:

> We appraised the fee simple estate. That's — that's a slightly — I would say that's a local issue here. That's required in Virginia. Typically, a buyer, like the buyer that testified this morning, is buying the leased fee estate, which is reflecting how the property is actually leased up. The fee simple estate actually reflects — it's similar, but it reflects the property leased at market — market rent at stabilized occupancy.

(Tr. at 80.)

Consistent with the Uniform Standards of Professional Appraisal Practice (USPAP), Bender testified that he relied on appraisals of "similar properties" in geographic areas ranging from Lynchburg, Virginia, to Kentucky and Ohio. In addition, he considered, *inter alia,* (a) the two previous sales (during the past five years, specifically, Kohen's purchase of the Property in 2010 and his subsequent sale of it in 2014), (b) what he described as the "market area" served by the Mall, (c) competing shopping centers, and (d) the average rent per square foot and occupancy rate of the Mall (and how that compared to other competing shopping centers).

Taking into account all of the considerations Bender described as relevant to an appraisal consistent with the standards in his industry *for a cost analysis approach,* he appraised the Property at $6,400,000.00. (P. Ex. 13, Part III, p. 58.) That appraisal began with a determination that the replacement cost for the structures on the Property was $32,925,857.00, depreciated by 90% to $3,292,586.00, and a land value of $3,100,000.00 (to the sum of which he added a rounding factor).

> The Cost Approach to Value estimation involves the summation of separate value estimates of land and improvements. It is based on the "Principle of Substitution," *i.e.,* the premise that an informed buyer would pay no more for improved real estate than the cost to the buyer of producing a substitute property.

(P. Ex. 13, Part III, p. 57.) Of course, this approach depreciates the replacement cost for new structures to account for the accrued depreciation of the existing ones, and in this instance, Bender applied a "physical depreciation" factor of 50%. In addition, he applied an "external obsolescence" factor of 40% to address "strong competition from [other available shopping availabilities] . . . resulting in decreased market rent and occupancy at the [Mall]." (P. Ex. 13, Part III, p. 58.)

If it is in the appraisal report or in Bennett's testimony, I did not find the mathematical basis for either of the two depreciation factors that Bender applied. The first he described as "wear and tear," without more, and the second was generally a consequence of the fact that the Property's "rent is well below average for the market." (Tr. at 89.)

Bender also appraised the Property using a *direct income capitalization approach,* which is "one year's income, net income, divided by rate — indicated rate of return or capitalization equals value." (Tr. at 89.) The factors that Bender used were (a) a gross annual market rent,[1] (b) expenses over the years 2011 through 2013 excluding real estate taxes ($720,072),[2] and (c) a capitalization rate of 11.5%. The capitalization rate was calculated by an analysis of "four recent sales of similar risk enclosed shopping malls," (P. Ex. 13, Part III, p. 72), of which two were the Property itself. (Tr. at 95.) Essentially, the equation is the net operating income for some period, divided by the sale price, yielding a quotient which is the cap rate. That yields an appraisal, for the income capitalization method, of $6,475,000.00 (rounded).

Finally, using a *sales comparison approach,* Bender considered the sale of the Property in 2010, the sale of the Property in 2014, a third sale in North Carolina (also a sale to Kohen), and a fourth sale in Tennessee. (P. Ex. 13, Part III, pp. 74-77.) Those comparisons yielded an appraisal of $6,460,000.00 for the Property.

With those three approaches, Bender concluded that the fee simple value of the Property as of January 1 in each of the years 2010 through 2014 was $6,500,000.00.

On cross-examination, Bender acknowledged that Standard 1.5 of the USPAP standards require that the appraiser analyze all sales of the property under examination that occurred within three years prior to the effective date of the appraisal, one of which was a sale of the Property in May 2008. He further testified that his "analysis . . . was January 2014, so I did not go back that far," despite the fact that the effective date of the appraisal was 2010. (Tr. at 105.) Finally, Bender acknowledged that his failure to include the 2008 sale was a valid criticism. *Id.*

Responding to his inclusion of the sale in bankruptcy in 2010, Bender testified that there were 45 bidders at the auction, and "they're putting this up — they basically put this up for auction. They want to get the highest price they can." (Tr. at 107.)

B. *Analysis*

At the outset, I note that this case involves four tax years, 2010, 2011, 2012, and 2013. The first two are governed by Virginia Code § 58.1-3984(A) and *West Creek Associates.* The second two years are governed

---

[1] This figure was derived from the annual rent roll as of January 2014 (shown on P. Ex. 13, Part III, pp. 61-63), refined by other factors (described on P. Ex. 13, Part III, pp. 64-68.)

[2] This figure was derived from historical expense statements and operating expenses for a "similar enclosed shopping mall." (P. Ex. 13, Part III, p. 69.)

by the amended Code § 58.1-3984(B), a statute not yet addressed by the Supreme Court of Virginia.

Regardless of what statute applies, in order for Staunton Mall to prevail for any of the tax years in question (the second half of 2010 through 2013), it must first establish the fair market value of the Property. Without that, the inquiry ends.

First, it is not clear that Bender was appraising the Property to determine its "fair market value" as that term has been defined by the Supreme Court of Virginia. As I noted, the term as he understood it was defined in his appraisal document, but that definition nowhere reflects that fair market value is the value of property equal to a "sale price when offered for sale 'by one who desires, but is not obliged, to sell it, and is bought by one who is under no necessity of having it.'" (*See, supra.*)

To be sure, Bender's (and USPAP's) definition refers to (a) the parties' "acting prudently," (b) to a "price . . . not affected by undue stimulus," (c) to the parties' being "typically motivated," and (d) to the parties' "acting in what they consider to be their best interests." Except perhaps for the reference to "undue stimulus," each of the other criteria fails to address the seller's obligation (or lack of one) to sell or any necessity (or lack of one) for the buyer to purchase. For example, even with a sale at bankruptcy or other forced sale, a seller might, under the circumstances, be acting prudently, be highly motivated, and be acting in her own best interest, given the other alternatives. That, of course, assumes the seller has any authority as to the decision to sell or as to the conduct of a sale in a bankruptcy proceeding.

"Undue stimulus" is not defined, and I acknowledge that that (somewhat and, probably, purposefully vague) requirement might conform Bender's definition of "market value" to the definition the Supreme Court of Virginia has applied to "fair market value." Even given the possibility (and without holding that the two definitions are identical), the Court is being asked to decide this case on a technical definition adopted by an appraisal foundation, rather than a definition that clearly controls cases such as this one. Exacerbating the problem is that an appraisal entirely consistent with USPAP is not always consistent with the requirements of the law of the Commonwealth and does not always yield a conclusion as to "fair market value," as that term has been defined by our Supreme Court.

In *City of Richmond v. Jackson Ward Partners, L.P.*, 284 Va. 8 (2012), the taxpayer's expert testified that, "under the Uniform Standards of Appraisal Practice, he must consider the eight tax parcels as one property from a legally permissible point of view, and that it would have been appraisal error for him to value the Property" in a fashion inconsistent with those standards. *Id.* at 28. The Supreme Court of Virginia held that, despite relying on the appraiser's conclusions, the taxpayer had not proved the property's fair market value, notwithstanding the fact that the appraiser strictly applied the standards applicable to his profession. Although it was not the definition

of fair market value that was at issue in that case, the decision makes it clear that it is the law of the Commonwealth, not standards adopted by any other organization, that governs the requirements for proving "fair market value."

I acknowledge, but do not attempt to reconcile, an apparent inconsistency in the law arising from the language of Virginia Code § 58.1-3984(B), which puts on the taxpayer the burden of proving that the assessment by the taxing authority "was not arrived at in accordance with generally accepted appraisal practices, procedures, rules, and standards as prescribed by nationally recognized appraisal organizations such as the International Association of Assessing Officers . . . ." The (at least) apparent inconsistency is that the assessor must adhere to rules adopted by recognized appraisal organizations (and did not in *City of Richmond*), but the taxpayer's appraisal cannot, without running the risk (as he did in *City of Richmond*) of running afoul of the law. I acknowledge, too, that Bender's definition of "market value" is the same as the definition used by the International Association of Assessing Officers.

Based on the fact that Bender's appraisal used a definition of "market value" that is different from the clear definition of "fair market value" so frequently mandated by the Supreme Court of Virginia, the Court finds that Staunton Mall has not proven the fair market value of the Property.

Predicated on the determination that Staunton Mall did not prove, by a preponderance of the evidence, the fair market value of the Property, the Court concludes that it did not pass the threshold requirement to go forward with its case, and the Court dismisses the Complaint.

Nevertheless, my philosophy is that the function of a trial court is dramatically different from that of an appellate court. Appellate courts routinely decide issues on the narrowest possible dispositive issue. My view is that trial courts should decide all substantive issues in the case so that, if the appellate court disagrees with the trial court's disposition (either because the appellate court views the issue on which the trial court decided as not being the dispositive issue or because it disagrees with the trial court's conclusion on that specific issue), the appellate courts need not remand cases for further consideration of questions that the trial court could have addressed at the outset. Accordingly, despite my view that the case ends here, I must also decide the case as if Bender's definition of "market value" were to be construed consistently with the Supreme Court of Virginia's definition of "fair market value" when used in cases such as these. Hence, the next inquiry is whether the evidence offered by Staunton Mall has established the fair market value of the Property.

To determine the value of the Property, Bender used the three generally accepted approaches:

### a. *Sales Comparison Approach*

"This approach is primarily applied as a check upon the reasonability of the conclusions of the other approaches to value by comparing the unit value indicated by the comparable sales data to the indicated unit value from the Income Capitalization and Cost Approaches to value." (P. Ex. 11, Part III, p. 81.)

As to the *sales comparison approach,* Bender concluded that the value of the Property was $6,460,000.00. In arriving at that figure, he acknowledged that he (a) did not consider the sale in May of 2008, but he did consider (b) the sale of the Property out of the bankruptcy proceeding in 2010, (c) the sale of the Property in 2014 (after the tax years in question), as well as (d) a sale in North Carolina (at which Kohen was the purchaser) and a sale in Tennessee in March 2013. To the extent that his appraisal is predicated in whole or in part on the sales comparison approach, the appraisal is flawed for two reasons.

First, Bender acknowledged that the applicable standards required that he consider all sales of the Property within three years prior to the effective date of his appraisal. Given that his appraisal covered the second half of 2010 and the tax year 2011, the sale in May 2008 was one that he should have considered in order to comply with his own stated standards for those tax years. Indeed, Bender acknowledged that he failed to do so, and that his failure to take into account that earlier sale was a valid criticism of his appraisal.

Second, Bender did take into account a forced bankruptcy sale in 2010. Despite his testimony that there were numerous bidders at the sale, no sale in bankruptcy can meet the standard of a sale by one who desires, but is not obligated, to sell it. It is, if not by definition, surely as a fact of which the Court can take judicial notice, a forced sale and one at which properties generally sell for depressed prices. One may willingly file for bankruptcy, but once there, the disposition of assets can hardly be characterized as a sale by a willing seller.

A third comparable was a sale of shopping center in Tennessee in March 2013.

> In appraisal practice, it is preferable to select as comparable sales "properties similar to the subject property that have recently been sold, are listed for sale, or are under contract (*i.e.,* for which purchase offers and a deposit have been recently submitted)." Appraisal Institute, *The Appraisal of Real Estate* 397 (11th ed. 1996). This preference is due to the fact that a hypothetical purchaser acquiring the property on the effective date of the valuation would not know of later sales and contracts and thus they would not affect his or her decision as to value. The Uniform Standards of Professional

Appraisal Practice ("USPAP") recommend that, in the case of a retrospective appraisal (*i.e.*, one conducted after the effective date of the valuation), sales subsequent to the effective date of the appraisal be used sparingly. "In the absence of evidence in the market that the data subsequent to the effective date were consistent with and confirmed market expectations as of the effective date, the effective date should be used as the cut-off date for data considered by the appraiser." USPAP, *Statement on Appraisal Standards No. 2* (SMT-2) (2012-13 ed.).

*Army-Navy Country Club v. City of Fairfax*, 86 Va. Cir. 1, 7-8 (Fairfax Cnty. 2012).

Although the County could hardly complain about the sale in Tennessee because it yielded the highest unit value of all of the comparables that Bender considered, it nevertheless was a sale after the effective date of the assessments (or levies) at issue (*i.e.*, levies for the second half of 2010, and tax years 2011 through 2013). The County's assessment (or levy) for 2013 was effective January 1, 2013.

Considering that Bender (a) ignored one sale (the sale in 2008) that he was required by his own standards to consider, (b) included one sale that could not qualify as a sale at fair market value (the forced sale in bankruptcy in 2010), and (c) one sale beyond the time frame recommended by USPAP, one must question the validity of his conclusions based on this approach.

Finally, at least as to the sales comparison approach, Bender acknowledged that his "main analysis here was January 2014, so I did not go back that far." (Tr. at 105.) If Bender's analysis was for January 2014, it is difficult to conclude that his appraisal reflected the fair market value of the Property (at least on the sales comparison approach) for the years prior to his analysis.

I note that Staunton Mall roundly criticized Hickey for not considering sales that occurred after his assessment effective January 1, 2009, so what is good for the goose prospectively must be good for the gander in hindsight. I think I got that right.

The Court finds that Staunton Mall's sales comparison approach is flawed and cannot be considered as establishing the fair market value or as a check on the other two approaches.

### b. *Direct Income Capitalization Approach*

Using the income capitalization approach, Bender concluded that the value of the Property was $6,475,000.00. As I noted above, using this approach, the value is the product of an equation in which the factors are one year's net income divided by an "indicated rate of return."

The net income is actually "the anticipated first year net income," (P. Ex. 13, Part III, p. 60), and that is based on "market rent." The most probable

rent that a property should bring in a competitive and open market reflection [sic] all conditions and restrictions of a lease agreement . . . ." (P. Ex. 13, Part III, p. 60, n. 3.) For the determination of income, Bender noted that "[a]s of January 2014, approximately 291,755 SF or 68.88% of the space was occupied as shown on the rent roll included on the following pages." *Id.* Using the rent roll for January 2014, Bender calculated a base rent for anchor tenant space, in-line space, and outparcel space and compared the rental rates and opined that the base rents were "well below average for a center in this region" based on data from *Realtyrates.com,* 1st Quarter 2014. *Id.* at 63. Bender then described, both in testimony and in Plaintiff's Exhibit 13, other steps to arrive at an effective gross income (EGI), after which he deducted estimated expenses.

Of consequence is the disclaimer in bold that appears immediately after the description of the mechanism to arrive at a market value using the direct income capitalization approach:

> It is important to note the purpose of this analysis is to estimate the market value of the fee simple estate as of the effective date of this appraisal and *not* to predict the future performance of the subject property, which may vary significantly.

(P. Ex. 13, Part III, p. 60) (emphasis in original).

What is remarkable is that Bender's focus in determining value by this approach was markedly similar to his focus in determining value using the sales comparison approach. With the latter, he candidly acknowledged that his "main analysis here was January 2014, so I did not go back" to include the sales his standards required. With the income approach, the analysis was based on data from 2014 (both his actual income data from the property and his corporative data from *Realtyrates.com),* which was at least a year after the years for which he was charged to determine fair market value. To be sure, Bender acknowledged that his appraisal using this approach could not be used to predict "future performance," but by acknowledging that the purpose was "to estimate the market value of the fee simple estate *as of the effective date of this appraisal,"* he called into question whether his appraisal was relevant to, much less determined, the value of the Property for the tax years in question.

### c. *Cost Analysis Approach (or Cost Approach)*

Much of what I state here is redundant to the statement of facts, but rather than cause the reader to look back, I accept the risk of repeating myself.

As to the cost approach, Bender concluded that the value of the Property was $6,400,000.00. As I noted above, this approach is an "estimation [that] involves the summation of separate value estimates of land and

improvements. It is based on the 'Principle of Substitution,' *i.e.,* the premise that an informed buyer would pay no more for improved real estate than the cost to the buyer of producing a substitute property." (P. Ex. 13, Part III, p. 57.)

Bender and Hickey substantially agreed as to the percentage of physical depreciation (approximately 50%). However, Bender added an additional depreciation factor of 40% based on his assessment of "external obsolescence," which is a "loss in value or diminished utility due to negative influences from outside the site." *Id.* The basis that Bennett offered for his assessment of external obsolescence was "strong competition from [two nearby competitor shopping opportunities]," demonstrated by a comparison of the per square foot rental rates of the Mall and "retail centers in the region according to *Realtyrates.com,* 1st Quarter 2014 market survey." *Id.* at 58.

Bender offered no evidence or explanation of the method by which he converted raw data (whatever that data was) to the percentage depreciation factor for external obsolescence. Of all the possibilities of what that percentage depreciation factor might have been, it is notable that the factor that he applied led inexorably to a cost approach value which was within 1% of the value he placed on the property by the sales comparison approach and within 1.2% of the value that he placed on the property by the direct income capitalization approach, both of which are suspect.

With this more detailed analysis of the evidence, and assuming Staunton Mall was using the correct definition of "fair market value," I conclude, still, that Staunton Mall did not prove, by a preponderance of the evidence, the fair market value of the Property. Accordingly, the Court concludes on a different basis that Staunton Mall did not pass the threshold requirement to go forward with its case, it did not rebut the presumption, and the Court dismisses the Complaint on this second basis.

### III. Assuming Staunton Mall Did Establish the Fair Market Value of the Property, Has It Rebutted the Presumption?

Assuming Staunton Mall has established the fair market value of the property (which, as I have stated, the Court does not), it must rebut the presumption by showing that the Property was assessed at more than fair market value. There was no serious argument concerning the question of the uniformity of the assessment. In drafting this portion of the opinion (which is not necessary if I am correct that Staunton Mall has not crossed the threshold of proving fair market value), I note that the Court never reaches the issue of whether the presumption is rebutted because the inquiry simply is not necessary. Moreover, I note that "[t]he effect of [the unrebutted] presumption is that even if the assessor is unable to come forward with evidence to prove the correctness of the assessment this does not impeach it since the taxpayer has the burden of proving the assessment

erroneous." *West Creek Assoc.,* 276 Va. at 409 (citations omitted). The curious part of this case (and a reason that I am engaging in this exercise) is that the evidence was that the "assessor [was] unable to come forward with evidence to prove the correctness of the assessment."

## A. *Facts Regarding BRMAC's Assessment*

Called by Staunton Mall as its own witness, David Hickey, the President of BRMAC, testified that, although the stipulation "sets out the component parts of the" initial assessment, "that does not mean that's the cost approach." (Tr. at 66.) He agreed that the assessment was predicated on a sale on May 6, 2008, for $21,700,000.00, six months prior to the effective date of the assessment. *Id.* He also agreed that there was no "official record card showing the value arrived at by the income approach" and that he did not have "any printout of an income approach that was printed out at the time that [the] assessment was done." (Tr. at 67.) He added that he had "the representation of [his] electronic file record that [he] used back then," *id.,* and that there is "a printout of the electronic data that went into computing that value at that time." (Tr. at 68.)

In the County's case-in-chief, Hickey, having been qualified as an expert to render an opinion on the value of the Property, testified that that he was in the process of completing the reassessment during the summer of 2008, and, in May, the Property sold for $21,700,000.00. "[T]hat was the most recent evidence of value that we had; so I . . . judged my valuation accordingly. I did undertake to do an income analysis on [the Property], but that was more or less to justify — to see if the value derived from the income approach would justify what . . . they paid for it." (Tr. at 126-27.)

As to the sales comparison approach, Hickey testified that there were "no comparables in Augusta County," but he did consider a mall in Delaware in 2006 and the sale of the Property in 1997 (for $17,075,000.00). (Tr. at 127-28.)

Hickey testified that he considered the cost approach, but he acknowledged that "once the value was established to be roughly $21 million, I had to work within the confines of the system to get the value presentation to represent that value." (Tr. at 130.) Hickey testified that he took into account the physical dimensions of the improvement on the Property and his knowledge of the categories of renters that leased space in those improvements, and that he "made adjustments to the depreciation for the different component parts to reflect [what he considered to be different] conditions of the different segments of the structure" to arrive at a value, in "an effort to get the value down in that $21 million range that the sale was." (Tr. at 132-133.)

Hickey testified that he also considered the income capitalization approach, which he summarized as "value [being] equal to income divided by rate." (Tr. at 134.)

> In this case, we knew what the value was [—] $21.7 million. So even if we take [Bender's] capitalization rate of .12, that would mean that the sales price would necessitate an income of . . . I think $2,600,000.00, something like that. So it does not really matter what the initial — either the rate or the income is because the value was established by the sale. . . . And you can — you can make adjustments — in essence, monkey around with the — vacancy rate or the expense ratio, but the bottom line is you're going to come back to value, which was represented by the sale that occurred in May of 2008, six months before our assessment, for $21,700,000.

(Tr. at 134-35.) Recall that Bender's characterization of the equation was "one year's income, net income, divided by rate — indicated rate of return or capitalization[,] equals value." Hickey acknowledged that he did not obtain rent figures from the owners because he had asked for it in the past; it was not forthcoming without a court order, "so over the years I have just gone with what I consider to be economic rent on these things." (Tr. at 151.)

B. *Analysis*

### 1. *As to Years 2010 and 2011*

To carry its burden as to the tax years 2010 and 2011, pursuant to Virginia Code § 58.1-3984(A) (as it was prior to the amendment in 2011 and as construed by *West Creek Associates)*, Staunton Mall must prove, by a clear preponderance of evidence, that BRMAC committed manifest error or that it disregarded controlling evidence.

The "clear preponderance" standard does not appear in the statute or any of its predecessors. Nevertheless, it was adopted by the Court as early as 1940 in *Washington County Nat'l Bank v. Washington County,* 176 Va. 216 (1940). In that case, the Court referred to "act approved March 10, 1938, Acts of Assembly, 1938, ch. 97, p. 163, [which] provided that: . . . 'In [a real estate tax relief] proceeding the burden of proof shall be upon the taxpayer to show that the assessment against the real estate involved is out of line with the assessment against other comparable real estate in the same magisterial district . . . .'" *Id.* at 220. Despite the vanilla language of the statute regarding the unspecified "burden of proof," the Court held: "Courts are reluctant to override the judgment of assessors and of boards of equalization. Inequalities are inevitable; to avail they must be striking and must be made to appear by a clear preponderance of evidence." *Id.* at 222. Although I have not found the Code reference to the Act that Justice Holt quoted, it appears to be a direct ancestor of the current statutes.

One way in which Staunton Mall could carry its burden to prove manifest error is to prove a sufficient disparity between the fair market value and the

assessed value, so long as the assessment does not fall within a range of a reasonable difference of opinion.

Curiously, the concept of "manifest error" has never appeared in any iteration of the statute. It first appears in *Norfolk v. Snyder,* 161 Va. 288, 292-93 (1933), in which the Court adopted it from a secondary source: "Conclusions of a board of commissioners will not be disturbed unless it appears that there has been a manifest error in the manner of making the estimate, or that evidence which should be controlling has been disregarded. *Cooley on Taxation,* section 1618, note, p. 3235."

Assuming the Court accepts Bender's appraisal of $6,400,000.00 as the fair market value of the Property, one can hardly dispute that there is a sufficient disparity between that figure and the assessed value of $19,305,500.00. Given a sufficient disparity, the initial inquiry is whether the assessment and the taxpayer's appraisal are within range of a reasonable difference of opinion. Although the Supreme Court has not offered much guidance as to how to gauge that, a difference of 66% cannot be within a reasonable range.

Under these circumstances, Staunton Mall would have shown manifest error under Virginia Code § 58.1-3984(A) as construed by *West Creek Associates,* and it would have rebutted the presumption that the assessment is correct. Hence, the fair market value would be established at $6,400,000.00.

## 2. *As to Years 2012 and 2013*

To carry its burden as to the tax years 2012 and 2013, pursuant to Virginia Code § 58.1-3984(B), Staunton Mall must prove, by a preponderance of the evidence, that BRMAC committed manifest error or that it disregarded controlling evidence. One way Staunton Mall can carry its burden to prove manifest error is to prove a sufficient disparity between fair market value and the assessed value, but, even if the assessment does not fall within a range of a reasonable difference of opinion, Staunton Mall must also prove that the assessment was not arrived at in accordance with generally accepted methods.

The Supreme Court construed the burden of proof language in Code § 58.1-3984(A) to mean a clear preponderance. When the statute was amended, the General Assembly maintained the phrase "burden of proof," leaving it on the taxpayer but requiring the taxpayer to "show by a preponderance of the evidence that the property . . . is valued at more than its fair market value . . . ." In light of my conclusion that the 2011 amendment to the statute was the legislature's response to the holding in *West Creek Associates,* I further conclude that its eschewing the phrase "clear preponderance" was not accidental.

My comments above with respect to the disparity and whether the assessment falls within a reasonable difference of opinion apply with equal force here. That leaves the question of whether BRMAC arrived at its

assessment in accordance with generally accepted methods. With respect to the latter question, I conclude that the evidence would not support the assertion that assessment by BRMAC was in accordance with generally accepted methods or with requirements established by controlling case law.

On its face, it is understandable that Hickey relied almost exclusively (if not entirely) on the sale of the Property in May 2008 as fixing its fair market value for the assessment in 2009. However, in *Keswick Club, L.P. v. County of Albemarle,* 273 Va. 128 (2007), such a narrow approach was rejected. In that case, the Court characterized the question before it as "whether the county failed to properly consider the income and sales approaches to valuation before basing its assessment solely on the cost approach." *Id.* at 132. In disposing of that issue, the Court articulated the guidelines necessary to cloak an assessment with the presumption of correctness.

> In determining the fair market value of real estate, taxing authorities commonly use one or more of three valuation approaches: the cost approach, income approach, and sales approach. Each of these approaches utilizes different characteristics of a property to estimate fair market value, and each analyzes different elements of the property which would likely affect the price a potential buyer would be willing to pay for the property on the open market. Ideally, an appraisal should, if possible, derive its final determination of a property's value using all three approaches in order to maximize the likelihood that the valuation accurately reflects the property's fair market value. [Citations omitted.]
>
> However, with respect to any given property, a taxing authority may determine that the use of one or more of these approaches is not feasible. In cases where a taxing authority bases an assessment of fair market value solely on one approach in determining the fair market value of property, the resulting assessment is entitled to the presumption of validity so long as the taxing authority "consider[s] and properly reject[s]" the other valuation methods. *HCA Health Services,* 260 Va. at 330-31, 535 S.E.2d at 170; *Tidewater Psychiatric Inst.,* 256 Va. 140-41, 501 S.E.2d at 763. In applying the "considers and properly rejects" standard to a taxing authority's decision to apply a single approach, we have refused to afford a presumption of validity to an assessment when the taxing authority failed to make an "effort to acquire the data necessary to perform appraisals" based on the other

approaches. *HCA Health Services,* 260 Va. at 330, 535 S.E.2d at 170.

*Keswick Club,* at 137. Despite the county's assessor testimony that he "'looked at all three approaches to value' before choosing to base his assessment solely on the cost approach," *id.* at 134, he also acknowledged that he "rejected the income approach because he did not receive any income statements or other financial information pertaining to Keswick Club. However, the assessor acknowledged that he never requested any such information." *Id.* Not overawed by the assessor's explanation, the Court noted that he need not have been deterred by his not having received a response to his request because he had statutory authority to demand the financial information pursuant to Virginia Code § 28.1-3294.

Without putting too fine a point on it, Hickey, in essence, appeared to testify that he knew what the value was (determined by the sale price of May 2008), so he adjusted the other factors in the equation to arrive at that result. Focusing only on the one deficiency analogous to the one noted in *Keswick Club,* Hickey clearly did not seriously consider the income capitalization approach because he, like the assessor in *Keswick Club,* did not bother to accumulate the data to calculate it.

Again, under these circumstances, Staunton Mall would have shown manifest error under Virginia Code § 58.1-3984(B), and it would have rebutted the presumption that the assessment is correct; hence, the fair market value would be established at $6,400,000.00.

## IV. *Conclusion*

I have never had a case that I decided both ways, and, in fact, despite appearances to the contrary, I have not done so in this case. I am not equivocating about the conclusion. I have found, and held, that Staunton Mall did not prove the fair market value of the Property, I have found that on two bases, and I am confident of the finding on both. My purpose in going further was not to dilute or render less certain that finding, but to attempt to save time when the case is appealed, as I am certain that it will be.

Regardless of the fact that the presumptively correct assessment may have its roots in a barren field, Staunton Mall did not produce sufficient evidence of the Property's fair market value to pass through the gate to prune the presumption. Nevertheless, because we got a good look at it, I am left with a presumption that the assessment is correct, despite the fact that it may not be. Worse, neither party has presented the Court with a satisfactory value for the Property. Still, because it was the burden of Staunton Mall to prove fair market value, and because it did not, it cannot prevail.

I suspect this case is illustrative of the reason that the presumption is so strong and the procedure for rebutting it so precise and exacting. Were

it otherwise, in an instance such as this, the Court would be burdened with plowing unknown ground to unearth an appropriate assessment, on speculation. As "Judge Cooley says in *Cooley on Taxation,* section 1612: 'Courts cannot substitute their judgment as to the valuation of property for the judgment of the duly constituted tax authorities.'" *City of Norfolk v. Snyder,* 161 Va. 288, 292 (1933). In this case, because it has no other option, the Court is left to lean only on the slender reed of the County's assessment, fortified by the statutory presumption.